# IN THE COURT OF APPEALS OF IOWA

No. 20-0070
Filed April 14, 2021

**ESTATE OF ED ALBAUGH,**
　　Plaintiff-Appellant,

**vs.**

**UPS FREIGHT,**
　　Defendant-Appellee.
_____

　　Appeal from the Iowa District Court for Polk County, David Porter, Judge.


　　The Estate of Ed Albaugh appeals from the grant of summary judgment for UPS Freight on the Estate's application to enforce workers' compensation settlement. **AFFIRMED.**


　　Channing L. Dutton and Robert R. Conklin of Lawyer, Lawyer, Dutton, Drake & Conklin, L.L.P., West Des Moines, for appellant.

　　Donna R. Miller of Miller, Zimmerman & Evans, PLC, Des Moines, for appellee.


　　Heard by Bower, C.J., and Doyle and Mullins, JJ.

**DOYLE, Judge.**

Contending settlement of Ed Albaugh's petition for partial commutation of workers' compensation benefits had been reached before he died, the Estate of Ed Albaugh applied to the district court to enforce the settlement. The Estate and UPS Freight filed dueling motions for summary judgment. The district court found "that the parties engaged in settlement negotiations that did not result in an agreement on its final terms." So the court found there was no agreement for the court to enforce. It denied the Estate's motion and granted UPS's motion. The Estate appeals.

## I. Facts and Procedural History.

Ed Albaugh was a driver for United Parcel Service. In 2005, while on the job, he was injured in a serious collision with another tractor-trailer. He was off work for about a year due to his injuries. He returned to work at UPS in 2006 and continued to work until 2012, but only because his manager and co-workers informally accommodated him. UPS removed Albaugh from his job in 2012 and did not allow him to work since that time. Albaugh filed for workers' compensation benefits. In a 2014 arbitration decision, a deputy workers' compensation commissioner found that Albaugh sustained a permanent and total industrial disability as a result of his 2005 injuries, and awarded him lifetime permanent total disability benefits of $676.38 per week.

In March 2017 Albaugh petitioned the workers' compensation commissioner for a partial commutation of his benefits.[1] He calculated the 1102

---

[1] The partial commutation allows the claimant to receive a lump sum of the discounted value of some, but not all, of the future weekly

remaining weeks of benefits (based on his life expectancy) to total $745,370.76. He sought a lump-sum payment of $562,229.82 for the commuted value of the first 1101 weeks. He requested the last week of benefits remain open, as well as medical benefits. UPS answered the petition denying that Albaugh had correctly calculated his benefits and denying that he established commutation of benefits was in his best interests. In June 2017, UPS's counsel faxed a letter to Albaugh's counsel:

> UPS has authorized me to settle this claim for a partial commutation (leaving the last week pending) as long as Mr. Albaugh will agree to settle the medical with an MSA[2] administered by Ametros that has a revisionary interest with Gallagher Bassett/UPS. Is this something he is interested in?"

UPS requested a response to its offer several times. Albaugh's attorney responded in September 2017. He emailed UPS's counsel, "[W]e are interested in getting more information about the CMS idea. I cannot tell you he will do the CMS plan, but he is willing to look at the idea . . . which is progress. What triggers this is the willingness to do the partial commutation." The attorneys continued to communicate about the medical-benefits issue. By November, UPS's counsel

---

benefits to which he is entitled. This type of commutation is, for some, the best of both worlds. It allows a lump sum fund to pay outstanding debts and attorney's fees. At the same time, it preserves the worker's right to lifetime medical benefits related to the injury and right to review-reopening if the medical condition changes.

John Lawyer & James R. Lawyer, 15 *Iowa Practice Series, Workers' Compensation 2020-2021*, § 27.2, p. 380 (Thomson Reuters 2020).

[2] A Workers' Compensation Medicare Set-Aside Arrangement (WCMSA) is a financial agreement that allocates a portion of a workers' compensation settlement to pay for future medical services related to the workers' compensation injury, illness, or disease. These funds must be depleted before Medicare will pay for treatment related to the workers' compensation injury, illness, or disease. Albaugh was on Medicare at the time of UPS's closed file request.

emailed: "Are they[3] in agreement?" Albaugh's counsel responded, "So far, not a word back. I've learned to leave them alone. I will find a way to nudge them."

In February 2018, the Worker's Compensation Commissioner scheduled a hearing for May 1 on Albaugh's partial-commutation petition. Parties' counsel continued their discussions about the medical-benefits issue—some by telephone. On Saturday, April 21, UPS's counsel emailed Albaugh's counsel:

> UPS will agree to the commutation and will run a new MSA evaluation to address the change in amount that concerns your clients.
> I will prepare the settlement documents.
> With this, are we OK informing the WCC that we do not need the hearing?

The following Monday, Albaugh's attorney answered by email: "Let me call Ed."

Later that day, counsel for UPS reported to her clients:

> The attorney is going to discuss our agreement to the partial commutation this afternoon. He says if they do not agree, he will just dismiss the petition. That would mean they could not get a commutation in the future unless you agreed to it (the law has changed since they first filed). He understands that you will get new MSA numbers.
> I will let you know what they agree to.

The next day, April 24, UPS's counsel emailed Albaugh's counsel: "The commuted numbers are attached. I will let you fill in the use of the money and your fee." Attached was a partial-commutation petition page-one with commuted numbers filled-in. But the numbers were not based on Albaugh's correct age. So later that day, UPS's counsel sent another email with a partial-commutation petition page-one; this time with corrected numbers:

> Sorry about the mis-calculation re: his age. I have attached the corrected numbers using age 62. I will ask my clients if they are

---

[3] A reference to Ed Albaugh and his wife.

willing to adjust the interest rate. I did take a look at the decisions and it they are consistent that the rate used is that in place at the time of decision.

The revised figures showed a partial commutation lump sum pay-out for 1060 weeks to be $481,147.21. Albaugh's counsel responded:

Thanks Donna, and let me know. I think there is room to compromise on this issue. I could not find the interest rate from the month of 9-17 but did see that August 17 was 1.24 and November was 1.50. We could use 1.50 as a compromise.

Two days later, on Thursday April 26, UPS's counsel emailed back:

I spoke to my clients regarding your request/proposal. They are not in agreement to pay any more than the commuted value at the current interest rate. Please let me know how Mr. Albaugh wants to proceed.

On that same morning, Albaugh's counsel replied: "Thanks Donna, I will talk to them."

On Sunday, April 29, two days before the scheduled May 1 hearing, UPS's counsel emailed Albaugh's counsel: "Channing—I did not notify the deputy that we would not need her time on Tuesday. Are you ok with me doing that now?" On Monday April 30, Albaugh's counsel responded:

Yes, we don't need a hearing. I have a final PC with them today but they did not set a time. I'll let you know right away what they want me to do.

UPS's counsel then emailed the deputy commissioner: "Channing and I have an agreement that will not require the hearing scheduled for tomorrow morning." By email, the deputy thanked UPS's counsel for the notification. Three days later, Albaugh and his wife were tragically killed in a motorcycle collision.

In January 2019, Eric Albaugh, as personal representative of Ed Albaugh's estate, signed a revised petition for partial commutation using the same figures

that appeared on UPS's April 24, 2018 proposed partial commutation petition, and submitted it to UPS for signature. UPS and its workers' compensation carrier refused to sign the petition or pay any settlement monies to the estate. After failing to obtain relief from the workers' compensation commissioner, Albaugh's estate applied to the district court seeking to enforce the partial-commutation settlement agreement.[4] UPS answered and later filed a motion for summary judgment asserting there was no settlement agreement. The estate countered with its own motion for summary judgment. After vigorous briefing by both parties and a hearing, the district granted summary judgment for UPS and against the Estate. Albaugh's estate appeals.

## II.    Standard of Review

"We review a district court's grant of summary judgment for correction of errors at law." *Hedlund v. State*, 930 N.W.2d 707, 715 (Iowa 2019). "Summary judgment is appropriate only when the record shows no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Id.* (citing Iowa R. Civ. P. 1.981(3)). "We view the summary judgment record in a light most favorable to the nonmoving party." *Id.* "[O]ur review is 'limited to whether a genuine issue of material fact exists and whether the district court correctly applied

---

[4] The application alleges the workers' compensation commissioner refused to enforce the settlement "based on its belief it does not have enforcement powers, and not based on the merits of the Albaugh claim." It also alleges the commissioner directed the estate "to file this action in the district court seeking an order deeming the employer to have signed the settlement documents, or other appropriate remedy, consisting of signing the commutation petition so that it might be approved by the commissioner."

the law.'" *Id.* (citing *Pillsbury Co. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 434 (Iowa 2008)).

## III.   Analysis

After considering the parties' arguments and reviewing the record, the district court found there was no agreement to enforce.  We agree.

"[O]ral settlement agreements are binding so long as there is an offer, an acceptance, and a meeting of the minds regarding the terms of the agreement." 15A C.J.S. *Compromise and Settlement* § 21, at 96 (2012).  "Settlement agreements are essentially contracts, and general principles of contract law apply to their creation and interpretation." *Sierra Club v. Wayne Weber LLC*, 689 N.W.2d 696, 702 (Iowa 2004) (citations omitted).  "In order to be bound, the contracting parties must manifest their mutual assent to the terms sought to be enforced." *Id.* (citation omitted).  In other words, the parties must express their mutual assent to the terms of the contract.  *Schaer v. Webster Cty.*, 644 N.W.2d 327, 338 (Iowa 2002).  Mutual assent depends on objective evidence, not the hidden intent of the parties.  *Id.* "Mutual assent is present when it is clear from the objective evidence that there has been a meeting of the minds." *Royal Indem. Co. v. Factory Mut. Ins. Co.*, 786 N.W.2d 839, 846 (Iowa 2010).

The mode of assent is termed offer and acceptance.  *Heartland Express, Inc. v. Terry*, 631 N.W.2d 260, 268 (Iowa 2001).  Although on April 21, 2018, UPS agreed to a commutation, it wasn't until April 24 that UPS made a specific offer through its counsel's April 24, 2018 email.  Even then, the interest rate issue— which affects the amount of the lump sum—remained up in the air: "I will ask my clients if they are willing to adjust the interest rate."  To which Albaugh's attorney

responded: "Thanks Donna, and let me know. I think there is room to compromise on the issue." On April 26, UPS's counsel informed Albaugh's counsel that UPS was "not in agreement to pay any more than the commuted value at the current interest rate." So at this point there was a hard offer by UPS. Now the question becomes whether Albaugh accepted that offer.

A binding contract also requires acceptance of the offer. *Magnusson Agency v. Pub. Entity Nat'l Co.-Midwest*, 560 N.W.2d 20, 26 (Iowa 1997). Acceptance of an offer is a manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer. *Heartland Express*, 631 N.W.2d at 270 (citing Restatement (Second) of Contracts § 50). "The rule is well settled that in a contract by offer and acceptance, the acceptance must conform strictly to the offer in all its conditions, without any deviation or conditions whatever," or otherwise "there is no mutual assent and therefore no contract." *Shell Oil Co. v. Kelinson*, 158 N.W.2d 724, 728 (Iowa 1968). After telling Albaugh's counsel that UPS was unwilling to compromise on the interest issue, UPS's counsel requested: "Please let me know how Mr. Albaugh wants to proceed." The response was: "Thanks Donna, I will talk to them." This cannot be construed as an acceptance to the offer.

Here, the back and forth correspondence between counsel shows any agreement was subject to approval by the Albaughs—"I'll let you know right away what they want me to do." And the ball was last left in their court—"I will talk to them." Unfortunately, they tragically were killed before they responded to UPS's last offer. The parties never got on the same page about the interest rate to be

applied to the commutation. Albaugh did not agree to the last interest rate proposed by UPS. There was no mutual assent. So no contract to enforce.

Cancellation of the May 1 hearing is not objective evidence that the parties reached an enforceable agreement. Albaugh's attorney was still awaiting marching orders from his clients. The hearing could have been rescheduled.

That Albaugh's counsel now argues the interest rate was nonnegotiable[5] and left nothing for Albaugh to accept after UPS agreed to a commutation does not obviate the need for Albaugh's express assent to the agreement. The interest rate had a direct effect on the lump sum amount. So Albaugh's counsel, rightly or

---

[5] Iowa Code section 85.48 (2017) states:

> When partial commutation is ordered, the workers' compensation commissioner shall fix the lump sum to be paid at an amount which will equal the future payments for the period commuted, capitalized at their present value upon the basis of interest at the rate provided in section 535.3 for court judgments and decrees.

"Nothing in this rule is to prevent waiver of the discount in subrule 6.3(2) by the employer or insurance carrier." Iowa Admin. Code § 876-6.3. "Insurance companies sometimes waive the discount as part of a settlement." John Lawyer & James R. Lawyer, 15 *Iowa Practice Series, Workers' Compensation 2020-2021*, § 27.2, p. 380 n.11 (Thomson Reuters 2020).

> When an original notice and petition for commutation of remaining future weekly benefits, either full or partial, is filed, the remaining future benefits may be commuted to present dollar value. If the remaining future weekly benefits are converted to a present value, the present dollar value shall be determined as provided in this subrule. A discount will be used to convert the value of remaining future weekly benefits to present dollar value. The discount will be based on a compound interest rate calculated pursuant to Iowa Code section 668.13(3) and in effect on the date informal agreement between the parties is reached for commutation and the number of weeks of remaining future benefits. The interest rate used to determine the discount shall be specified on the original notice and petition for commutation filed for approval by the commissioner.

Iowa Admin. Code § 876-6.3(2). It seems very odd to us that the discount can be waived altogether, but that the interest rate cannot be negotiated by the parties.

wrongly, tried to negotiate the most favorable interest rate for his client. The parties never got on the same page regarding the interest rate to be applied to the commutation. Even if the interest rate were nonnegotiable, Albaugh was still in control with the ability to take the offer or leave it. There was no meeting of the minds on the issue.

With all applicable principles in mind, we cannot find that the parties ever mutually assented to the same settlement agreement. We therefore affirm the district court's ruling on the parties' motions for summary judgment.

**AFFIRMED.**