# IN THE COURT OF APPEALS OF IOWA

No. 15-1363
Filed July 27, 2016

**MATTHEW N. HOFFMAN,**
    Plaintiff-Appellant,

**vs.**

**GARY L. KOUNKEL, RICHARD L. KOUNKEL,
RONALD E. KOUNKEL, and THOMAS G.
KOUNKEL, as Co-Executors of the
Estate of Edna E. Kounkel,**
    Defendants-Appellees.

_____

    Appeal from the Iowa District Court for Plymouth County, John D. Ackerman, Judge.

    Matthew N. Hoffman appeals the district court's denial of his summary judgment motion and grant of summary judgment in favor of the appellees. **REVERSED AND REMANDED.**

    Joel D. Vos of Heidman Law Firm L.L.P., Sioux City, for appellant.

    David W. Nelmark and R. Michael Hayes of Belin McCormick, P.C., Des Moines, and Robert B. Brock II of Law Office of Robert B. Brock II, P.C., LeMars, for appellees.

    Heard by Potterfield, P.J., and Mullins and McDonald, JJ.

**MULLINS, Judge.**

Matthew N. Hoffman appeals the district court's denial of his summary judgment motion and grant of summary judgment in favor of Gary L. Kounkel, Richard L. Kounkel, Ronald E. Kounkel, and Thomas G. Kounkel, as co-executors of the estate of Edna E. Kounkel (the Kounkels).  Because we find the district court erred in granting summary judgment in favor of the Kounkels, we reverse and remand for further proceedings consistent with this opinion.

## I.  Backgrounds Facts

On or about June 5, 1997, Elden and Edna Kounkel, as sellers, entered into a real estate contract with the Iowa Agricultural Development Authority (IADA), as buyer, for the purchase of 85.65 acres of land for the sum of $250,000.  The sum was to be repaid in fifty-nine semiannual installments of $8438.79 on September 1 and March 1 of each year beginning September 1, 1997, with a final payment of the outstanding amount to be paid March 1, 2027.  The contract terms included a 5.5% interest rate with interest payments to be tax-exempt to the sellers.  Per the terms of the contract, the IADA assigned its interest to Hoffman.[1]  Beyond the contractual terms required by the IADA, negotiations for the sale occurred between Gary Kounkel, Elden and Edna's son, and Hoffman and Hoffman's father.  Elden and Edna are now deceased, and

---

[1] The assignment was made to Hoffman and Tonya Entenman.  Hoffman and Entenman worked with the IADA through the IADA's Iowa Beginning Farmer Loan Program, under which Hoffman and Entenman were approved as qualifying "beginner farmers."  The IADA's involvement enabled Hoffman and Entenman to acquire the land at a below-market interest rate while providing the Kounkels tax-free interest.  Entenman then assigned her interest to Hoffman by quitclaim deed.

their interest in the contract is held by the Estate of Edna Kounkel with the above-identified parties serving as co-executors.

The original draft of the contract called for a $250,000 sale price, with no down payment, semiannual payments of principal and interest amortized over thirty years, with interest accruing on the unpaid balance at 5.5%, a balloon payment due on September 1, 2012, and no prepayment of principal prior to September 1, 2012, without the Kounkels' prior consent. Prior to the final execution of the contract, Hoffman requested and the Kounkels agreed there would be no balloon payment and the entire remaining balance would due at the end of the thirty-year amortization term. The interest rate, the manner of calculating the semiannual payments, and the other terms relevant here remained the same, excepting only that the Kounkels requested and Hoffman agreed to paragraph 32, which allowed the Kounkels to demand full prepayment of the remaining principal balance, plus accrued interest, on March 1, 2013, 2018, and 2023.

In dispute between the parties is paragraph 20 of the contract,[2] which provides as follows: "It is further agreed between the parties hereto that Buyer shall make no prepayment of principal balances owing hereunder prior to September 2, 2012 without Sellers' written permission."

On July 9, 2014, Hoffman tendered $158,314.66 to Edna, an amount in excess of the remaining balance owed, and requested a warranty deed. Edna

---

[2] Paragraphs 18 through 32 are contained in a document entitled, in part, "Continuation of Real Estate Contract." Both the Real Estate Contract, which contains paragraphs 1 through 17, and the "Additional Provisions" contained in the "Continuation of the Real Estate Contract" were executed by one or both of the Kounkels and the IADA. The documents are collectively referred to herein as "the contract."

refused Hoffman's payment. On September 18, 2014, following Edna's passing, Hoffman tried a second time to prepay the balance. This offer was also refused.

On January 12, 2015, Hoffman filed this lawsuit, seeking specific performance of the contract. After the Kounkels filed their answer, both parties moved for summary judgment. The same day the Kounkels filed their summary judgment motion, they also filed a motion to amend answer and file a counterclaim for reformation of the contract. The motions were argued in June 2015, following which the district court entered an order denying Hoffman's motion for summary judgment, granting the Kounkels' motion for summary judgment, and denying as moot the Kounkels' motion to amend. Hoffman now appeals.

## II. Scope and Standard of Review

Our review of the district court's grant of summary judgment is for correction of errors of law. *See Jones v. Univ. of Iowa*, 836 N.W.2d 127, 139 (Iowa 2013).

> A court should grant summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. In other words, summary judgment is appropriate if the record reveals a conflict only concerns the legal consequences of undisputed facts. When reviewing a court's decision to grant summary judgment, we examine the record in the light most favorable to the nonmoving party and we draw all legitimate inferences the evidence bears in order to establish the existence of questions of fact.

*Id.* at 139-40 (quoting *Pitts v. Farm Bureau Life Ins. Co.*, 818 N.W.2d 91, 96-97 (Iowa 2012)).

### III. Analysis

#### A. Contract Interpretation Principles

Contract "[i]nterpretation is the process for determining the meaning of the words used by the parties in a contract." *Pillsbury Co. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 435 (Iowa 2008). Absent consideration of extrinsic evidence, the interpretation of a contract is a legal issue. *Id.* "The cardinal rule of contract interpretation is to determine what the intent of the parties was at the time they entered into the contract." *Id.* at 437; *see also Peak v. Adams*, 799 N.W.2d 535, 543 (Iowa 2011) ("In the construction of written contracts, the cardinal principle is that the intent of the parties must control . . . ." (quoting Iowa R. App. P. 6.904(3)(n))). Though "[t]he most important evidence of the parties' intentions at the time of contracting is the words of the contract," the court "may look to extrinsic evidence, including 'the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties.'" *Peak*, 799 N.W.2d at 544 (citation omitted); *see also Pillsbury*, 752 N.W.2d at 436 ("[A]lthough we allow extrinsic evidence to aid in the process of interpretation, the words of the agreement are still the most important evidence of the party's intentions at the time they entered into the contract."). Further, we interpret a contract as a whole, *see Iowa Fuel & Minerals, Inc. v. Iowa State Bd. of Regents*, 471 N.W.2d 859, 863 (Iowa 1991), so as to give effect to all provisions, *see Carter v. Bair*, 208 N.W. 283, 283 (Iowa 1926).

## B. Contract Negotiations

In reaching its decision, the district court first discussed the negotiations between the parties and drafts of the contract before it reached its final form. *See Peak*, 799 N.W.2d at 544. The district court summarized this evidence as follows:

> Initial negotiations included a fifteen-year contract term with a balloon payment on balances owed at the end of the fifteenth year, on September 1, 2012. Without the benefit of discussion between the parties, an inclusion of a provision was added by the [Kounkels][3] which bars [Hoffman] from any prepayment of balances owing, prior to September 1, 2012, without the [Kounkels'] written permission.[4] The date coincided with the maturity date of the contract at the time when the negotiations called for a fifteen-year contract term. The parties never verbally discussed the provision, but agree the language precluded [Hoffman] from any right of prepayment at the stage of negotiations calling for a fifteen-year term limit. At the end of the fifteenth year, on September 1, 2012, a balloon payment for the balances owing was then due by [Hoffman]. The provision remained in all of the drafts and was incorporated at paragraph twenty of the final agreement between the parties . . . .
>
> After the proposed agreement was presented to the IADA for approval, [Hoffman] requested a thirty-year term with the elimination of a balloon payment. With the extension for the contract to thirty years, an inclusion of the provision was added by the [Kounkels] which calls for prepayment of the remaining principal balances on specific dates at the option of the [Kounkels]. . . .
>
> . . . .
>
> . . . At no time did the parties discuss any unilateral right to prepayment by the Plaintiff. At the time of the final agreement [Hoffman] did not provide any statements to the [Kounkels] to indicate an understanding [Hoffman] had a unilateral right to prepay balances owing after September 1, 2012.

---

[3] The Kounkels' attorney drafted the contract.

[4] The time limitation of "prior to September 1, 2012," originally appeared in the first draft of the fifteen-year contract as written by the Kounkels' attorney. Earlier, in a term sheet exchanged by the parties, the agreement indicated there would "be no prepayment of principal prior to the 15 year balloon without Seller's written permission."

## C. The District Court Order

In its analysis, the district court noted it was clear "[Hoffman] understood his right to prepay was barred without [the Kounkels'] consent during the period of negotiations when the contract called for [a] fifteen year term limit." The court determined the issue at hand was "the parties' intent after negotiations called for a thirty-year term." Looking at paragraph 32 of the contract, the court concluded:

> Consistent with the doctrine of perfect tender in time, an interpretation that allows for prepayment would lead to an unfair outcome. The parties were aware of the ability to contract for prepayments, prepayment prices, and obligations to make all principal and interest payments if not otherwise set forth in the contract. The parties' drafts support the [Kounkels'] right to protect against financial consequences. To do as [Hoffman] suggests [and read paragraph 20 as allowing prepayment after September 1, 2012,] would operate as a restraint on investment income. Narrowly read, the [Kounkels'] inclusion of paragraph twenty and thirty-two suggests protection against any prepayments by [Hoffman] that would cut off tax exempt investment income.

The court noted the general rule of a presumption against prepayment and that extrinsic evidence may be used to change the plain meaning of a contract. The court reasoned paragraph 20 was "unambiguous as it relates to any unilateral right of prepayment by Plaintiff after September 1, 2012," in light of the fact that paragraph 32 granted an express right to the Kounkels to demand early payment, paragraph 20 lacked comparable express terminology, and the parties never discussed a right for Hoffman to prepay. The court further reasoned Hoffman "uses the words 'prior to September 1, 2012' to mean an implied term contrary to facts and circumstances surrounding the agreement, history of negotiations, the complete absence of contemporaneous discussion on any prepayment right of [Hoffman], and the words used in the contract." Thus, the

court concluded "[t]he only reasonable interpretation of [paragraph] 20 as it relates to prepayment rights for [Hoffman] is to prohibit [him] from any prepayment after September 1, 2012 without the [Kounkels'] permission." The court also noted there was no relevant extrinsic evidence to be considered by the trier of fact nor was reliance on the credibility of extrinsic evidence necessary for its determination that the contract was unambiguous.

### D. Prepayment of the Loan

#### 1. Interpretation of Paragraph 20

Based on the language of paragraph 20, Hoffman argues the phrase "prior to September 1, 2012" means prepayment is allowed *after* that date and any other interpretation makes the temporal phrase superfluous. Hoffman avers the district court impermissibly used extrinsic evidence to change rather than interpret the contract; the contract, when viewed as a whole, supports that the prohibition on prepayment expired as of September 1, 2012; and the district court improperly applied the "perfect tender in time" rule when paragraph 20 allowed for prepayment.

The Kounkels disagree, arguing first the extrinsic evidence was necessary for the court to determine the intent of the parties, the perfect tender in time rule applies as no right to prepayment was expressly provided in the contract, and the contract as a whole demonstrates there was no intent to give a right to prepayment. In the event this court finds the contract grants a right to prepayment, the Kounkels contend they are still entitled to summary judgment because of a misunderstanding between the parties and because there was no

meeting of the minds. Finally, in the alternative, the Kounkels ask that this case be remanded to the district court for consideration of their reformation claim.

On its face, the contract unambiguously provides that Hoffman is prohibited from prepaying the balance before September 1, 2012, without the written consent of the Kounkels. This provision is consistent with the law in Iowa, which presumes no right to prepayment. *See Lett v.* Grummer, 300 N.W.2d 147, 150 (Iowa 1981) (noting "the law has long been" that a seller "cannot be compelled to take the money until it is due"); *Anderson v. Haskell*, 45 Iowa 45, 47 (Iowa 1876); *see also Great Plains Real Estate Dev., L.L.C. v. Union Centr. Life Ins. Co.*, 536 F.3d 939, 944-45 (8th Cir. 2008) (agreeing with the district court's reasoning that "Iowa follows the common law 'perfect tender in time' rule, holding a borrower has no right to pay off a mortgage before the maturity date, absent a loan agreement provision allowing prepayment").[5] The parties dispute whether this same provision grants Hoffman the ability to tender payment *after* that date.

Contract provisions are not interpreted in isolation. *See, e.g.*, *Iowa Fuel & Minerals*, 471 N.W.2d at 863 (noting "a contract is to be interpreted as a whole"). Thus, we look to other portions of the contract when interpreting paragraph 20.

Paragraph 23 of the contract provides: "It is further agreed between the parties hereto that the machine sheds and the SlurryStor shall not be removed from the property being sold hereunder prior to May 1, 2002 without Sellers

---

[5] We note the Restatement (Third) of Property § 6.1 (1996) acknowledges the "[t]raditional common-law principles" that denied "an unrestricted right of prepayment," and finds it "inconsistent with the usual expectations of the parties who are not law-trained" and "often contradicts the principle that the documents should be construed against the drafter." The restatement "recognizes an unrestricted right to prepayment unless the mortgage or some other enforceable agreement between the parties restricts or eliminates that right."

written permission." The Kounkels do not dispute that "prior to May 1, 2002," means Hoffman was able to remove the specified buildings after May 1, 2002. Paragraph 23 supports Hoffman's desired interpretation that paragraph 20 similarly enables prepayment *after* the limiting date of September 1, 2012.

The parties also cite to paragraph 32, which states the following:

> It is specifically agreed between the parties hereto, and notwithstanding anything set out above, that [the Kounkels], at their option, may call for full prepayment of the remaining principal balances owing hereunder, plus any accrued interest thereon, on the dates of March 1, 2013, March 1, 2018 and March 1, 2023, upon Sellers giving 90 days prior written notice to [the IADA], or Beginning Farmer assignees hereunder, namely [Hoffman] . . . .

Contrary to the district court's holding, this provision does not necessarily conflict with the wording of paragraph 20. Instead, it can easily be read to provide the Kounkels a right comparable to that given Hoffman in paragraph 20—the ability to demand, at certain designated times, full payment prior to the complete duration of the thirty-year contract.

We also disagree with the district court's view that Hoffman's interpretation of paragraph 20 would necessarily "operate as a restraint on [the Kounkels'] investment income," and that Hoffman is essentially imposing his will to make an earlier payment in defeat of the Kounkels' continued right to investment income. The district court seemed to clearly consider that such a result would be an unfair outcome and one to which the Kounkels would never have agreed; thus, the district court relied on a "tender in time" interpretation of the contract.

We focus on the negotiations between the parties as evidenced by the documents leading to the final contract and the undisputed fact that the fifteen-year balloon payment was removed at Hoffman's request and paragraph 32 was

added at the Kounkels' request. We do not consider extrinsic evidence which is in dispute or for which credibility is in dispute. *Pillsbury*, 752 N.W.2d at 436 ("When the interpretation of a contract depends on the credibility of extrinsic evidence or on a choice among reasonable inferences that can be drawn from the extrinsic evidence, the question of interpretation is determined by the finder of fact."). The original draft of the contract provided for a $250,000 sale price, no down payment, semiannual payments amortized over thirty years, interest at 5.5%, a balloon payment due on September 1, 2012, and no prepayment prior to September 1, 2012, without the Kounkels' prior consent. The only changes in the final contract are (1) at Hoffman's request, the balloon payment was removed and the entire remaining balance would be due at the end of the thirty-year amortization term, and (2) at the Kounkels' request, new paragraph 32 allowed them to demand full prepayment of the remaining principal balance, plus accrued interest, on March 1, 2013, 2018, and 2023.

If paragraph 20 is read as Hoffman argues, the differences to the Kounkels between the early draft and the final contract are: they will not automatically get their balloon payment in September 1, 2012, as originally agreed, but would have to wait until Hoffman tendered payment after September 1, 2012, or when the Kounkels demanded payment per paragraph 32. The removal of the balloon payment delayed the Kounkels' right to get their remaining principal for another fifteen years, subject to their right to demand payments per paragraph 32. On our limited record, we find no indication the Kounkels were unhappy with the original fifteen-year balloon. It was Hoffman who requested removing the required balloon; the Kounkels obviously tempered that by adding

paragraph 32. Hoffman's interpretation of paragraph 20, allowing, but not requiring, prepayment after September 1, 2012, seems perfectly consistent with the negotiations and intentions of the removal of the balloon, yet allowing payment after fifteen years. Any restraint on investment income as reasoned by the district court was arguably more favorable to the Kounkels in the last draft than in the earlier draft.

The Kounkels also rely upon paragraph 25, which enables Hoffman to obtain a deed to certain limited acres in order to construct new hog facilities. In the event Hoffman exercised his rights under this paragraph, he was required to

> deposit an amount equal to the deeded acres multiplied times $2,500.00 into [his own] interest bearing escrow account, which account shall be pledged as security for the payment of the land so deeded and that amount placed in said escrow account, plus any accrued interest, shall be paid by [Hoffman] to [the Kounkels] when demanded by [the Kounkels], but in any event, said payment shall not be made on or before the 1st day of September, 2012.

The Kounkels argue this provision provides the only avenue by which Hoffman may obtain early title to a small portion of the property through prepayment. But this provision is not inconsistent with paragraph 20. It provides an avenue by which Hoffman may secure ownership over only a portion of the total property, for a specific purpose, *before* September 1, 2012. Further, it does not call for prepayment, but rather that Hoffman set aside funds in an escrow account held by Hoffman with the limitation that "said payment shall not be made on or before the 1st day of September, 2012." That quoted clause can only be understood to mean payment was to be made after September 1, 2012.

Finally, the Kounkels point to the first paragraph of the contract, which provides when payments must be made: "[Hoffman] agree[s] to and shall pay the

sum of $8,438.79 principal plus interest on the 1st day of September and the 1st day of March of each year hereafter until the full principal balance owing hereunder . . . is paid by [Hoffman] to [the Kounkels]." The Kounkels argue that since the paragraph provides payment must be made "on," as opposed to "on or before," there is no ability to prepay. But this paragraph simply addresses the payment structure and general timeframe. It is a general paragraph entitled "Price," and does not serve to obviate the more specific provision provided in paragraph 20.[6] *See Christiansen v. Iowa Bd. of Educ. Exam's*, 831 N.W.2d 179, 189 (Iowa 2013) (noting that, where a conflict exists, "the more specific provision controls over the general provision").

As noted by the district court, the commonly accepted meaning of "prior to" is "in advance of" or "before." *Webster's Third New Int'l Dictionary* 1804 (unabr. ed. 2002). When the contract does not indicate otherwise, we give effect to this language "in accordance with its commonly accepted and ordinary meaning." *See Lange v. Lange*, 520 N.W.2d 113, 119 (Iowa 1994). We determine, viewing the contract as a whole, the collective terms of the contract can be interpreted to support Hoffman's claim he had the right to prepayment after the specified September 1, 2012 date.

The Kounkels argue any alleged right to prepayment would be implied rather than express and such an implied right is impermissible. As an initial matter, this court is not convinced the right to prepayment is implied only. The

---

[6] When discussing the first paragraph, the Kounkels also reference the amortization tables contained in the contract, which outline the date each payment is due, the specifics of each payment, and the resulting amounts owed, if the biannual payment schedule were followed through the thirty-year timeframe.

natural consequence of providing a limiting date in paragraph 20—as the Kounkels concede is the case in paragraph 23—is that some different action can occur after that time limitation has expired. To interpret "prior to September 1, 2012" otherwise would effectively write paragraph 20 out of the contract. *See Dickson v. Hubbell Realty Co.*, 567 N.W.2d 427, 430 (Iowa 1997) ("Because we give effect to the language of the entire contract, it is assumed that no part of it is superfluous and an interpretation that gives a reasonable meaning to all terms is preferred to one that leaves a term superfluous or of no effect."). If the parties had intended to require permission for prepayment at any time, then the parties could simply have omitted any time limitation from paragraph 20 or extended that timeframe to September 2027 when the contract was complete. As the time limitation is included, the provision cannot be read to apply both before and after September 1, 2012.

We find the right of prepayment is necessarily implied in paragraph 20. "Courts imply contractual terms where the obligation 'arise[s] from the language used or [is] indispensable to give effect to the intent of the parties.'" *Alta Vista Props., LLC v. Mauer Vision Ctr., PC*, 855 N.W.2d 722, 727 (Iowa 2014). By providing an end date on the limitation of prepayment, the parties, at a minimum, implied a right to prepayment thereafter. *See Fashion Fabrics of Iowa, Inc. v. Retail Investors Corp.*, 266 N.W.2d 22, 27 (Iowa 1978) ("Contractual obligations may arise from implication as well as from the express writing of the parties. 'A contract includes not only what is expressly stated but also what is necessarily to be implied from the language used; and terms which may clearly be implied from

a consideration of the entire contract are as much a part thereof as though plainly written on its face.'" (citation omitted)).

We conclude the district court erred when its interpretation of the contract concluded as a matter of law that the contract does not allow Hoffman to prepay balances owing after September 1, 2012.

### 2. Integrated Contract

The Kounkels contend the extrinsic evidence demonstrates there was no intent to grant Hoffman a right to prepayment. Hoffman argues the contract was an integrated agreement and thus extrinsic evidence cannot be used to vary the terms of the agreement. Hoffman further argues the extrinsic evidence does not provide support for the Kounkels' desired interpretation.[7]

"When an agreement is fully integrated, the parol-evidence rule forbids the use of extrinsic evidence introduced solely to vary, add to, or subtract from the agreement." *C & J Vantage Leasing Co. v. Wolfe*, 795 N.W.2d 65, 85 (Iowa 2011). "When the parties adopt a writing or writings as the final and complete expression of their agreement, the agreement is fully integrated." *Id.* Here, the agreement does not contain an integration clause, although the existence of such is only one factor in considering whether an agreement is integrated. *See id.* ("The presence of an integration clause is one factor we take into account in determining whether an agreement is fully integrated."). The Kounkels do not dispute that the contract is an integrated agreement. The contract at issue is

---

[7] Hoffman also argues the extrinsic evidence itself was improper as the district court considered an affidavit sworn by Gary Kounkel, which contained attestations about what his parents understood at the time of the contract. Hoffman argues the statements lack factual basis and the only factual basis proffered—namely, that Gary had conversations with his parents about their intent—is inadmissible hearsay.

detailed and contained many of the terms typically found in a comparable document. *See Peck v. Four Aces Farms, Inc.*, No. 14-1482, 2015 WL 4642386, at *6 (Iowa Ct. App. Aug. 5, 2015) (finding a writing was not fully integrated when "[d]escribing the written lease as skeletal would be generous considering the major bones it is missing" and "[o]ther terms typically found in a farm lease are absent"). Further, the parties engaged in lengthy negotiations, with multiple revisions to the document, which required approval by the IADA before the contract was then assigned to Hoffman. *See generally Whalen v. Connelly*, 545 N.W.2d 284, 291 (Iowa 1996) (finding the agreement was fully integrated where, in part, the parties were sophisticated, were represented by counsel, had equal bargaining power, and the negotiations occurred at arm's length). The contract was duly recorded with the Plymouth County Recorder, and the parties have acted under the terms of the contract for eighteen years. We have no doubt the agreement was, at the very least, "partially integrated," meaning it "w[as] intended as a final expression 'with respect to such terms as are included therein.'" *Bartlett Grain Co. v. Sheeder*, 829 N.W.2d 18, 24 (Iowa 2013) (citation omitted). The parol-evidence rule therefore bars the parties from contradicting those terms. *Id.*

Moreover, the extrinsic evidence provided does not support that a change to the plain terms is warranted. The record establishes there was no explicit discussion between the parties about granting Hoffman a right to prepayment. Instead, the parties discussed Hoffman's request to extend the contract from fifteen years to thirty years. As a result, the Kounkels were provided the opportunity to demand prepayment on certain designated dates. Paragraph 20

remained unchanged—there is no record the parties discussed extending the time limitation to thirty years—resulting in a contractual right to Hoffman to prepay the loan after the original fifteen years expired. The Kounkels' lack of evidence does not serve to indicate the provision means anything other than what it says.

The Kounkels appear to use the extrinsic evidence to demonstrate what they meant to say rather than to explain the meaning of what was actually said.[8] This is an impermissible use of extrinsic evidence. *Bankers Trust Co. v. Woltz*, 326 N.W.2d 274, 276 (Iowa 1982) ("The offer of extrinsic evidence was not an attempt to interpret the language actually used by the parties; it was an attempt to vary or alter language in the written agreement, and as such was inadmissible. Extrinsic evidence offered to show 'what the parties meant to say' instead of 'what was meant by what they said' is not admissible . . . ." (citations omitted)).

Under this alternative analysis, we find the Kounkels are not entitled to judgment as a matter of law.

### 3. Misunderstanding

In the alternative, the Kounkels argue there was a misunderstanding between the parties and, as Hoffman knew of the Kounkels' interpretation of the provision, Hoffman is bound by the Kounkels' meaning. The Kounkels also argue the misunderstanding means mutual assent was lacking and, thus, the disputed provision should be stricken from the contract.

---

[8] In their brief, the Kounkels repeatedly reference Hoffman's alleged failure to communicate his interpretation of paragraph 20. It is of note that the Kounkels are the original drafter of the agreement. *See Kerndt v. Rolling Hills Nat'l Bank*, 558 N.W.2d 410, 416 (Iowa 1997) (noting ambiguities in a "contract are strictly construed against the drafter").

For a contract to be valid, the parties must express mutual assent to the terms of the contract. If there is a misunderstanding in the language that relates to the object of the agreement so that "one party [understands] [it] is buying one thing and the other party thinks [it] is selling another thing, no meeting of the minds occurs, and no contract is formed." *Schaer v. Webster Cnty.*, 644 N.W.2d 327, 338 (Iowa 2002) (alterations in original) (citation omitted). "Yet, 'mutual assent is based on objective evidence, not on the hidden intent of the parties.'" *Id.* (citation omitted). "The misunderstandings of the parties must be reasonable under the circumstances and support a finding of a lack of mutual assent." *Id.* As to the Kounkels' first contention, there is no evidence in this record establishing Hoffman had reason to know the Kounkels did not intend the contract to say what was written. *See Centron DPL Co. v. Tilden Fin. Corp.*, 965 F.2d 673, 675 (Iowa 1992) (noting that, in the case of misunderstanding "where only one party knows or has reason to know of the different meaning attached by the other, that party is bound by the other party's meaning"). As noted by the Kounkels, there was no communication on prepayment or the meaning of this provision. In the initial draft, it was clear the prepayment limitation was meant to last the entire term of the contract. That contract was then amended to a thirty-year term, and the Kounkels obtained the right to demand early payment. By virtue of not adjusting the timeframe of paragraph 20, Hoffman also obtained a right to prepay after fifteen years. The Kounkels had added this disputed provision to the contract in the initial draft. There is no evidentiary basis on this record for their claim Hoffman knew the Kounkels intended something that was never communicated.

As noted by the court in *Schaer*, the misunderstanding must be reasonable under the circumstances. 644 N.W.2d at 338 ("[T]he claim of a misunderstanding by Schaer was not justified under the circumstances, and does not constitute a lack of mutual assent."). There is simply no reasonable basis for the Kounkels to believe a provision limiting prepayment prior to a certain date would also limit prepayment thereafter. The objective words state the prohibition expires on September 1, 2012; again, the Kounkels now rely upon the wording they wish had been used rather than the meaning of the words that were actually used by them in drafting the contract.

We further find, under this theory, the Kounkels are not entitled to judgment as a matter of law.

### E. Conclusions on Motions for Summary Judgment

For the foregoing reasons we reverse the grant of the Kounkels' motion for summary judgment, reverse the denial of Hoffman's motion for summary judgment, and remand for proceedings consistent with this opinion.

### F. Reformation

In addition to their motion for summary judgment, the Kounkels filed a motion to amend answer and file a counterclaim for reformation of the contract.[9] This motion to amend was denied by the court as moot in light of the court's grant of summary judgment in favor of the Kounkels. As we have reversed the

---

[9] The Kounkels argue the mistake was "in the expression of the contract," making reformation the appropriate remedy. *Nichols v. City of Evansdale*, 687 N.W.2d 562, 571 (Iowa 2004). When the mistake is in the expression rather than the formation, of a contract, "it normally makes no difference if the mistake is mutual or unilateral." *Id.* (citation omitted); *see also Soults Farms, Inc. v. Shafer*, 797 N.W.2d 92 (Iowa 2011) ("Where there has been a mistake, whether mutual or unilateral, in the expression of the contract, reformation is the proper remedy.").

district court's grant of summary judgment, the Kounkels' motion to amend is no longer moot, and we remand this matter to the district court for consideration of that motion on its merits.

**REVERSED AND REMANDED.**